**RECORD NO. 17-1196**

# In The
# United States Court Of Appeals
# For The Fourth Circuit

## CAROL FORESTER INNES,

*Plaintiff – Appellant,*

**v.**

## BARCLAYS BANK PLC USA
## STAFF PENSION PLAN COMMITTEE,

*Defendant – Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT CHARLOTTESVILLE

————————————

## BRIEF OF APPELLANT

————————————

Joseph W. Wright, III
DYGERT, WRIGHT,
 HOBBS & HEILBERG, PLC
415 4th Street, NE
Charlottesville, VA 22902-0000
(434) 979-5515

*Counsel for Appellant*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street  ♦  P.O. Box 1460 (23218)  ♦  Richmond, VA 23219
804-249-7770  ♦  www.gibsonmoore.net

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE...............................................................2

    A.    The Predecessor Legal Action...........................................2

    B.    The Legal Action Giving Rise to This Appeal.....................3

    C.    Request for Oral Argument ...............................................4

    Statement of the Facts.......................................................5

    A.    Employment History ........................................................5

    B.    Special Performance Bonus ..............................................6

    C.    Plan Language ..................................................................8

    D.    Pension Benefits .............................................................11

SUMMARY OF ARGUMENT ...........................................................13

ARGUMENT .....................................................................................14

    STANDARD OF REVIEW........................................................14

    I.    INNES' CLAIM IS NOT BARRED BY THE STATUTE OF LIMITATIONS ..............................................................15

    II.    THIS COURT SHOULD REVIEW THE DECISION TO DENY BENEFITS UNDER THE RESTORATION PLAN DE NOVO..............................................................................22

i

A.    The Administrator's Decision to Deny Innes Benefits Under the Restoration Plan is Neither Supported By Substantial Evidence Nor a Product of a Deliberate and Principled Reasoning Process ....................................................24

    1.    Lack of Substantial Evidence ........................................25

        a.    The District Court Mischaracterized the February 1994 Bonus as "Stay- Pay" ..................25

        b.    The Decision to Deny Benefits is Not Supported by the Plan Language That Existed Prior to the 1992 Amendment ................29

        c.    The Plan Administrator Could Not Have Reasonably Relied Upon Either the 1992 or 1994 Amendments to the Retirement Plans' Definition of Compensation .................................30

            (1.)    The 1992 Amendments to the Definition of "Compensation" are Void for Lack of Notice ............................31

            (2.)    The July 26, 1994 Amendment is Void Both for Lack of Notice and Because it Reduces Accrued Benefits in Violation of ERISA ..............................33

    2.    Lack of Principled Reasoning Process ...........................35

        a.    The Plan Administrator Has a Conflict of Interest in Relation to Innes' Claim Because He Has a Duty to Act in Her Interest ..................35

CONCLUSION .........................................................................42

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

Aetna Health Inc. v. Davila,
542 U.S. 200 (2004)............................................................36

Bailey v. Blue Cross and Blue Shield,
67 F.3d 53 (4th Cir. 1995) ................................................29

Bedrick v. Travelers Ins. Co.,
93 F.3d 149 (4th Cir. 1996) ..............................................35

Bond v. Marriott Int'l, Inc.,
637 Fed. Appx. 726 (4th Cir. 2016)...................................16

Booth v. Wal-Mart Stores, Inc.,
201 F.3d 335 (4th Cir. 2000) .................................... passim

Braden v. Wal-Mart Stores, Inc.,
588 F.3d 585 (8th Cir. 2009) ...............................................4

Brink v. DaLesio,
667 F.2d 420 (4th Cir. 1981) ...............................................4

Carden v. Aetna Life Ins. Co.,
559 F.3d 256 (4th Cir. 2009) .............................................37

Carey v. Int'l Brotherhood  of Elec. Workers Local 363 Pension Plan,
201 F.3d 44 (2nd Cir. 1999)...............................................16

Champion v. Black and Decker (U.S.), Inc.,
550 F.3d 353 (4th Cir. 2008) .............................................23

Collins v. Seafarers Pension Trust,
846 F.2d 936 (4th Cir. 1988) .............................................32

Colucci v. Agfa Corp. Severance Pay Plan,
431 F.3d 170 (4th Cir. 2005) .............................................22

iii

Cotter v. Eastern Conference of Teamsters Retirement Plan,
    898 F.2d 424 (4th Cir. 1990) ...........................................................16

Davis v. Bowman Apple Products, Inc.,
    2002 U.S. Dist. LEXIS 6204 (W.D. Va. 2002)............................36

Davis v. Burlington Industries,
    966 F.2d 890 (4th Cir. 1992) ..........................................................29

DiCioccio v. Duquesne Light Co.,
    911 F. Supp. 880 (W. D. Pa. 1995) ....................................... 33, 34

Evans v. Eaton Corp. Long Term Disability Plan,
    514 F.3d 315 (4th Cir. 2008) ..........................................................22

Firestone Tire & Rubber Co. v. Bruch,
    489 U.S. 101 (1989)........................................................................36

Gorski v. ITT Long Term Dis. Plan for Salaried Employees,
    314 Fed. Appx 540 (4th Cir. 2008)..................................................42

Helton v. AT&T Inc.,
    709 F.3d 343 (4th Cir. 2013) .................................................. 32, 42

Hunter v. Aetna Life Ins. Co.,
    2012 U.S. Dist. LEXIS 134911 (W.D. Va. 2012).........................24

Johannssen v. Dist. No 1 – Pac. Coast Dist.,
    292 F.3d 159 (4th Cir. 2002) ..........................................................38

LeFebre v. Westinghouse Electric Corp.,
    747 F.2d 197 (4th Cir. 1984) ..........................................................23

Martin v. Constr. Laborers' Pension Trust,
    947 F.2d 1381 (9th Cir. 1991) ................................................ 16-17

Metropolitan Life Ins. Co. v. Glenn,
    554 U.S. 105 (2008)........................................................................36

Miller v. Fortis Benefits Ins. Co.,
    475 F.3d 516 (3rd Cir. 2007) .................................................. 16, 17

iv

Miller v. Leathers,
    913 F.2d 1085 (4th Cir. 1990) ..........................................................15

Morrison v. Marsh & McLennan Companies, Inc.,
    439 F.3d 295 (6th Cir. 2006) ..........................................................16

Petrini Corp. v. Perini Constr., Inc.,
    915 F.2d 121 (4th Cir. 1990) ..........................................................14

Rodriguez v. MEBA Pension Trust,
    872 F.2d 69 (4th Cir. 1989) ........................................... 1, 15, 20, 21

Teamsters Joint Council No. 83 v. Centra, Inc.,
    947 F.2d 115 (4th Cir. 1991) ............................................................4

Wallace v. Freight Drivers & Helpers Local No. 557 Pension Fund,
    2012 U.S. Dist. LEXIS 91321 (D. Md. 2012) ................................18

White v. Sun Life Assur. Co.,
    488 F.3d 240 (4th Cir. 2009) ................................................. 15, 18

**Statutes:**

26 U.S.C. § 411(d)(6) .......................................................................33

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

29 U.S.C. § 1001(a) ............................................................................4

29 U.S.C. § 1002 ...............................................................................12

29 U.S.C. § 1022(a) ..........................................................................32

29 U.S.C. § 1024(b) ..........................................................................32

29 U.S.C. § 1024(b)(1) ......................................................................31

29 U.S.C. § 1054 ...............................................................................33

29 U.S.C. § 1054(g)(1)..............................................................................33

29 U.S.C. § 1054(h) ...........................................................................31, 33

29 U.S.C. § 1104(a)(1).............................................................................36

29 U.S.C. § 1104(a)(1)(A) ........................................................................35

29 U.S.C. § 1109..........................................................................................2

29 U.S.C. § 1132(a)(1)(B) ......................................................................1, 2

29 U.S.C. § 1132(g)(1)..............................................................................42

**Regulations:**

26 C.F.R. § 1.411(d)-6 ..............................................................................31

29 C.F.R. § 2520.104b-3 (a) .....................................................................31

## JURISDICTIONAL STATEMENT

Appellant Carol Forester Innes ("Innes") appeals from a Final Order of the U. S. District Court for the Western District of Virginia. The District Court filed a Memorandum Opinion and entered a Final Order granting judgment in favor of Appellee Barclays Bank PLC USA Staff Pension Plan Committee ("Pension Committee") on January 10, 2017, which were modified by Amended Memorandum Opinion and Amended Final Order dated January 11, 2017.

The District Court had jurisdiction under 28 U.S.C. § 1331 and The Employees Retirement Income Security Act ("ERISA") 29 U.S.C. § 1132(a)(1)(B), because this case was filed as a claim for pension benefits under ERISA. This Court has jurisdiction of the appeal under 28 U.S.C. § 1291.

Innes timely filed her Notice of Appeal on February 9, 2017.

## STATEMENT OF THE ISSUES

1. Whether the District Court in Innes' case was plainly wrong in failing to apply the rule articulated by this Court in Rodriguez v. MEBA Pension Trust, 872 F.2d 69 (4th Cir. 1989) about when a cause of action for denial of pension benefits accrues.

2. Whether the District Court was plainly wrong and ignored the weight of the evidence in concluding that the "Special Pay" Innes received in February 1994 was not pensionable compensation.

1

## STATEMENT OF THE CASE

**A.    The Predecessor Legal Action**

Innes filed her initial Complaint in the U. S. District Court for the Western

District of Virginia on March 5, 2014 pursuant to 29 U.S.C.S. §§ 1109 and

1132(a)(1)(B), requesting statutory damages for Barclays' failure to provide copies

of requested Plan documents (Count 1), seeking a determination that she is entitled

to retirement benefits under the Restoration Plan (Count II), and requesting other

equitable relief (Count III) and recovery of her attorney's fees (Count IV) (Civil

Action No. 3:14 cv 0008).[1]

On July 1, 2014, the defendants in that predecessor case filed a Motion to

Dismiss Count II and a portion of Counts III and IV of Innes' Complaint on the

grounds, *inter alia,* that Innes' claims were barred by the statute of limitations and

that Innes had not exhausted administrative remedies under the Plan.  Following

briefing by counsel and oral argument on October 16, 2014, the District Court filed

a Memorandum Opinion and Order on December 1, 2014, requiring Innes to

exhaust administrative remedies under the Plan and dismissing her Complaint

without prejudice to re-filing it if necessary after she exhausted administrative

---

[1] Joint Appendix at 665-66.  References to the Joint Appendix will be made as "JA
at _____."

2

remedies.  Significantly, the District Court in that case did not dismiss Innes' Complaint based upon the statute of limitations.

Prior to entry of the Order in that case, on October 31, 2014, Innes had submitted an Application for Benefits under the Restoration Plan to the Pension Committee, so that if the Court ruled that she was required to exhaust administrative remedies under the Plan, she would have begun the exhaustion process.  JA at 198-207.  By letter dated January 26, 2015, the Pension Committee denied Innes' claim for benefits under the Restoration Plan.  JA at 214-19.  By letter dated February 4, 2015, Innes, by her counsel, appealed the Pension Committee's denial of her claim.  JA at 313-16.  By letter dated April 2, 2015, the Pension Committee also denied Innes' appeal.  JA at 320-24.

**B.    The Legal Action Giving Rise to this Appeal**

After exhausting all administrative remedies available under the Restoration Plan, Innes filed her Complaint in the case now on appeal on April 22, 2015.  By Order entered on June 10, 2015, the District Court explained that each party would be deemed to have moved for summary judgment on the administrative record.  JA at 15.  After filing of the administrative record[2] and a supplement to that record[3] and extensive briefing of the issues by the parties, the District Court heard oral

---

[2] JA at 34.

[3] JA at 385.

arguments from counsel on July 11, 2016.  On January 10, 2017, the District Court issued a Memorandum Opinion and Final Order denying all of the relief Innes requested in her Complaint.  JA at 641 and 660.  On January 11, 2017, the District Court filed an Amended Memorandum Opinion and entered an Amended Final Order.  JA at 661 and 680.

**C.     Request for Oral Argument**

A core purpose of ERISA is to protect employees' retirement security and benefits.  29 U.S.C. § 1001(a).  ERISA is, of course, a remedial statute and should be given a liberal construction in order to carry out the vitally important public policies of protecting the integrity of employee benefit plan assets and of deterring fiduciary violations."  Brink v. DaLesio, 667 F.2d 420, 427 (4th Cir. 1981); Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, 123 (4th Cir. 1991) (as a remedial statute, ERISA "should be liberally construed in favor of protecting the participants in employee benefit plans").  "Congress intended that private individuals would play an important role in enforcing ERISA's fiduciary duties – duties which have been described as the 'highest known to the law'."  Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 598 (8th Cir. 2009).

To ensure that the remedial and protective purpose and intent of ERISA is fully effectuated in this case, it is necessary for this Court to schedule and hear oral argument on the issues raised in Innes' appeal.

4

**Statement of the Facts**

**A.    Employment History**

Innes was employed by BarclaysAmericanCorporation from July 16, 1979 to March 31, 1981.  JA at 353 (¶ 1).  Then, she was employed by BarclaysCommercialCorporation ("BCC") from April 1, 1981 to March 1, 1994, during which time she served in various management positions.  Id. (¶ 2).  CIT Financial Group ("CIT") purchased BCC effective March 1, 1994 and Innes remained an employee of the successor corporation until June 28, 1994.  Id. (¶ 3).

As a member of the management team at BCC, Innes' total compensation and collective years of service qualified her to be vested in two retirement plans, the Restated Retirement Plan of BarclaysAmericanCorporation ("Retirement Plan") and the BarclaysAmericanCorporation Retirement Restoration Plan ("Restoration Plan"), a pension benefit plan put in place to provide deferred compensation and retirement benefits for employees whose compensation exceeded limits set by the Internal Revenue Code for qualified employee benefit plans.  Although Innes left CIT in June 1994, she did not reach retirement age and become eligible to receive a pension benefit until December 1, 2013.  JA at 389.

5

**B.    Special Performance Bonus**

In the early 1990's when Barclays Bank USA ("Barclays") made the affirmative decision to sell BCC[4] and began the effort to identify prospective purchasers, various BCC management personnel in Charlotte, North Carolina, including Innes, were tasked by the team of investment bankers managing the sale with gathering and supplying input for the offering documents being created for the sale of that business unit.  The investment bankers assembled the information provided and some key BCC employees were asked to review what had been assembled.  Innes, as Chief Financial Officer ("CFO") of BCC, was asked to review and comment on all of the financial representations.

As the deadline drew near for completing the offering documents, the investment bankers questioned whether the information being presented regarding "factoring operations," i.e. the backroom operations which handled the accounts receivable bookkeeping for BCC clients, was a clear, relevant and coherent representation of information prospective buyers would need to have available.  JA at 356 (¶ 16).  When Innes voiced concerns about the content of this section of the offering documents, the investment bankers asked her to come to New York in August 1993 to work in their offices to revise the documents.  With the assistance of her staff in Charlotte, she supplied additional operating statistics regarding

---

[4] JA at 353 (¶ 3).

"factoring operations," re-drafted this section of the offering documents, and worked in a hands-on-manner with the investment banking team to pull this section into sharper focus, all in preparation for the hoped-for sale of BCC.

During the second half of 1993, Innes worked many evenings and weekends to prepare for and participate in meetings and negotiations concerning the sale of BCC. Due to Barclays' requirement to maintain a level of secrecy within BCC about Barclays' interest in selling that business unit, she frequently left the office with other personnel at the end of the work day, only to return hours later to compile information, prepare and package documents for transmittal to the investment bankers and drop late night packages at the post office. JA at 356 (¶ 16). All of this work was beyond the scope of Innes' normal job responsibilities as CFO of BCC.

In recognition of the fact that key management employees would be required to spend significantly more time than their normal working hours performing services well beyond the scope of their standard job descriptions, by summer 1993, Barclays USA's management began discussing a performance bonus for certain employees who made a substantial contribution to the sale effort, the payment of which would be triggered by closing on a successful sale of BCC. JA at 353 (¶ 6), 359 (¶ 5), and 411-14.

After the execution of a sales contract with CIT on November 8, 1993, Innes' work preparing for the sale of BCC changed.  From November 1993 through early February 1994, the period the Federal Reserve Bank was reviewing the sale, Innes was called on to perform a heightened level of leadership managing various business risks as BCC was under scrutiny by CIT performing its due diligence, which was definitely beyond the standard job requirements of Innes' position with BCC.  The Federal Reserve Bank approved the transfer of ownership in early February 1994, and closing on the sale occurred on March 1, 1994.

On or about February 28, 1994, Innes received a bonus check in the amount of $244,055.67, which was a gross bonus of $390,000.00 minus applicable federal and state taxes.  The pay stub that accompanied her bonus payment explained and described this payment as "Special Pay."  JA at 404.  This Special Pay later was reported as income on the W-2 form BCC issued to Innes for 1994.  JA at 407-08. Innes also included the "Special Pay" as earned income on her 1994 federal tax return.  JA at 406-08.

## C.    Plan Language

Paragraph 10 of the Restoration Plan clarifies that all the terms used in the Restoration Plan have the same meaning as those terms are defined in the Retirement Plan amended as of January 1, 1986.  JA at 41.  Therefore, the definition of "compensation" used in the Retirement Plan amended as of January 1,

1986 is the definition to be used in calculating pension benefits under the

Restoration Plan.

Curiously, the record developed in the District Court suggests that there

were two separate plan documents for the Barclays Retirement Plan:  The Restated

Retirement Plan amended and restated as of January 1, 1984 (the "1984 Plan") (JA

at 460), and the Restated Retirement Plan amended and restated as of January 1,

1989 (the "1989 Plan").  JA at 44.  One might normally conclude that the 1989

Plan simply updated the 1984 Plan, but it appears that there were two distinct plan

documents, both of which were amended periodically.  That would only have

confused a plan participant looking for information about making a claim for

benefits under the plan.

Prior to a 1992 amendment, Paragraph 1.12 of the 1984 Plan defined

"Compensation", for purposes of calculating benefits under the Plan, as:

> The base pay, salary or wages paid to any Employee by the
> Employee, plus overtime, commissions, <u>bonuses</u> paid through the end
> of the calendar year in which his Accrued Benefit is determined,
> Management Incentive Payments (except such payment made during
> 1993), including salary reduction amounts pursuant to section 401(k),
> and section 125 but shall not include directors fees, management
> incentive payments which were deferred pursuant to a deferred
> compensation election by the Employee, or any amount contributed
> by the Employee pursuant to this Plan or any other benefit plan or
> program of the Employer….

(emphasis added).  JA at 467.  Paragraph 1.3 of the 1989 Plan included an

equivalent definition for "Annual Compensation".  JA at 57.

In 1992, Barclays amended the definition of "compensation" in both the 1984 Plan and the 1989 Plan to exclude "stay-pay" and retention bonuses.  JA at 57, 323 and 326.  Even though she was employed by BCC during 1992 and thereafter, Innes never received notice of the 1992 amendments to either the 1984 Plan or the 1989 Plan.  JA at 357 (¶ 26).[5]  She similarly received no notice of any amendment to the Restoration Plan.

Then on July 26, 1994, six and one-half months following BCC's payment of the Special Pay to Innes and eleven other employees for their exceptional performance and effort, Barclays once again amended the definition of "annual compensation" in Section 1.3 of the 1989 Plan to add:

> Effective as of July 26, 1994, no amount received by a Participant as special pay, stay pay or severance pay, including but not limited to any amount paid from any pool of funds created in connection with the sale of Barclays Commercial Corporation, shall be included in the definition of Annual Compensation.

JA at 590 (emphasis added).  Barclays similarly amended the language of the Restoration Plan on July 26, 1994.  JA at 590.  Again, Innes received no notice of the July 26, 1994 amendments.  JA at 357 (¶ 26).[6]

---

[5] Terry Oelschlaeger, another BCC Vice-President, testified by Affidavit that he also received no notice of any amendment to the Plan.  JA at 361 (¶ 18).

[6] Janet Grell, a Barclays Services Corporation employee, corroborated the fact that no notice was given participants about the July 26, 1994 amendment.  JA at 424.

**D.    Pension Benefits**

In May 1994, more than two months after closing on the BCC divestiture, John A. Amato ("Amato"), then Pension Administrator with Barclays Services Corporation, sent Innes a letter dated only "May 1994" concerning her deferred vested pension benefits, which stated that beginning on December 1, 2013, when she reached age 65, she would be entitled to receive the following monthly pension benefit:

| | |
|---|---|
| $2,804.58 | Under the Restated Retirement Plan |
| 1,585.84 | Under the Retirement Restoration Plan |
| $4,390.42 | Total monthly benefit |

JA at 191.

Three months later on August 8, 1994, without any explanation, Amato sent Innes a "Revised" letter concerning her pension benefit which never even referred to the earlier May 1994 letter. JA at 195. The August 8 letter never indicated what was being revised or any reason for a revision but appears to have omitted certain information included in the earlier letter. Neither the May 1994 letter nor the August 8, 1994 letter even mentioned an amendment to any retirement plan. Innes requested a copy of the pension plan in 1994 from J. Carroll Thomas, Executive Vice-President for Human Resources for BarclaysAmericanCorporation. Despite her request, he never provided her either plan documents or a plan summary. JA at 263-64.

Following the instructions included in the two letters Innes received in 1994, Innes initiated communications with Barclays concerning her pension just prior to reaching age sixty-five, her full pensionable age.[7]  On or about September 13, 2013, Innes received an August 30, 2013 letter from Barclays Pension Service Center which attached various forms she had to complete and submit in order to begin receiving pension benefits effective December 1, 2013.  That August 30, 2013 letter notified Innes that her total monthly pension benefit beginning on December 1, 2013 would be $2,804.58, which did not include any benefit under the Restoration Plan. JA at 389.  That letter and the absence of information about her entitlement to a benefit under the Restoration Plan prompted Innes to once again request copies of the plan documents.

On September 20, 2013, Innes, by her attorney, forwarded Barclays Pension Service Center a letter requesting copies of both the Retirement and Restoration Plans in effect as of May 1994, with all amendments from 1979 to 1994.  JA at 189. That letter also requested an explanation about why the documents Innes received did not identify the benefits she was entitled to under the Restoration Plan.

---

[7]  Section 1.31 of the 1989 Plan defines "Normal Retirement Date" as the later of attained age 65 and the participant's age after five full years of service.  JA at 71. The 1984 Plan defines "normal retirement age" as 65.  JA at 473.  29 U.S.C. § 1002 defines "retirement age" as 65.  Barclays' August 30, 2013 letter to Innes acknowledges Innes' "retirement date" as December 1, 2013.  JA at 389.

When she did not receive either a copy of the plans or any other response, her attorney sent a second written request on October 31, 2013. JA at 402. Again, she received no response. Her attorney sent a third letter on November 22, 2013, which attached a completed application for benefits under the Retirement Plan but continued to request information about her benefits under the Restoration Plan. JA at 402. Barclays commenced paying Innes benefits of $2,804.58 per month under the Retirement Plan effective December 1, 2013, but otherwise did not respond. The absence of response led her to file the first suit seeking benefits under the Restoration Plan on March 1, 2014. On or about April 1, 2014, after Innes filed that action, Barclays sent her attorney copies of retirement plan documents for the first time. JA at 631.

## SUMMARY OF ARGUMENT

In granting judgment in the Pension Committee's favor, the District Court erroneously concluded that Innes' ERISA cause of action accrued years before she actually applied for and was denied benefits under the Restoration Plan, and therefore that her Complaint was barred by the statute of limitations. In reaching that conclusion, the District Court followed the "clear repudiation rule," which this Court has characterized as a narrow exception to the general rule governing the accrual of a cause of action for pension benefits and which this Court has applied in only two instances, when either no formal claim for benefits has been made or

when it is difficult to determine when a claim was made and denied. That limited

exception is not appropriately applied on the facts of this case, where Innes made a

formal claim for benefits under the Restoration Plan in October 2014 while the first

suit was pending in the District Court.  After the Pension Administrator denied her

initial claim, she appealed that decision and her appeal was denied on April 2,

2015.  Her ERISA cause of action accrued on the date of that final denial, and her

claim is not time-barred.

Moving to the merits of her claim for benefits, the District Court granted the

Plan Administrator's denial of benefits to Innes undue deference, in that the record

developed in that Court clearly demonstrates that the Plan Administrator's

determination was not the product of a deliberate and principled reasoning process

or supported by substantial evidence, which controlling precedent in this Circuit

requires.

## ARGUMENT

## STANDARD OF REVIEW

The District Court decided this case as if parties had filed cross-motions for

summary judgment on the administrative record.  JA at 15 and 661.  This Court

reviews _de novo_ a District Court's grant of summary judgment, applying the same

standard as the District Court but without deference to the District Court's

decision.  Petrini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123 (4th Cir. 1990).  A

plaintiff "is entitled to have the credibility of [her] evidence as forecast assumed, [her] version of all that is in dispute accepted, and all internal conflicts resolved favorably to [her]." Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (*en banc*).

## I.    INNES' CLAIM IS NOT BARRED BY THE STATUTE OF LIMITATIONS.

The District Court erroneously applied the "clear repudiation rule" to conclude that Innes' claim for pension benefits accrued either in August 1994, when Innes received a "Revised" letter from John Amato, then Pension Administrator, or alternatively in June 1997, when she was deposed as a non-party witness in the Boyd Case then pending in the U. S. District Court for the Western District of North Carolina.  As this Court has recognized, the general rule is that a cause of action for denial of pension benefits under ERISA does not accrue until a claim for benefits is made and formally denied.  See Rodriguez v. MEBA Pension Trust, 872 F.2d 69 (4th Cir. 1989); White v. Sun Life Assurance Co., 488 F.3d 240, 246 (4th Cir. 2009) (confirming Rodriguez as the "general federal rule").

There is very limited case law from this Court applying the clear repudiation rule; however, this Court has characterized that rule as a very narrow exception or alternative to the "general rule" to be applied only in "limited" circumstances where either there has been no formal denial of benefits or where, on the facts of a specific case, it is impossible to determine when the formal denial occurred.  See

15

<u>Cotter v. Eastern Conference of Teamsters Retirement Plan</u>, 898 F.2d 424, 429 (4th Cir. 1990) (recognizing a "clear mandate" to apply the general rule but noting that application of the general rule is "tricky" where there has been no formal denial of a claim for benefits)[8].  Here, Innes made a formal claim for benefits and there is no difficulty in determining when a formal denial occurred, so the "general rule" adopted by this Court should apply.

Even if the clear repudiation rule was otherwise an appropriate rule to consider, it would not apply in Innes' case because the rule requires, as a factual predicate, a "clear and continuing" repudiation of benefits.  <u>Martin v. Constr.</u>

---

[8] Not surprisingly, each of the cases cited by the District Court Judge in his Amended Memorandum Opinion as authority for the application of the "clear repudiation" rule is factually distinguishable from Innes' case.  Those courts elected to apply the "alternative" rule in cases where a plan failed to pay any benefit to an eligible participant (<u>Cotter</u>, supra); where a Plan Administrator sent monthly retirement checks which were only a portion of the benefit due (<u>Miller v. Fortis Benefits Ins. Co.</u>, 475 F.3d 516 (3rd Cir. 2007)); where an employer sent a rejection letter in response to a retired employee's application for portable term life insurance and returned the former employee's initial premium payment (<u>Morrison v. Marsh & McLennan Companies, Inc.</u>, 439 F.3d 295 (6th Cir. 2006)); where the initial language of the retirement plan which was distributed to the retiree on at least three occasions stated clearly that the plan was exempt from ERISA vesting requirements (<u>Bond v. Marriott Int'l, Inc.</u>, 637 Fed. Appx. 726 (4th Cir. 2016)); and where a retiree wrote a letter in 1991 claiming entitlement to a benefit and received a written response denying the benefit due to a break in service, then appealed that decision and received a second denial, and then applied for benefits again in 1996 prior to filing suit (<u>Carey v. Int'l Brotherhood of Elec. Workers Local 363 Pension Plan</u>, 201 F.3d 44 (2nd Cir. 1999).  In each of those cases, unlike the case at bar, there was a clear repudiation of benefits by the pension administrator to the participant through some affirmative act.

Laborers' Pension Trust, 947 F.2d 1381, 1385 (9th Cir. 1991); see also Miller v. Fortis Benefits Ins. Co., 475 F.3d 516, 521 (3rd Cir. 2007) (a "repudiation that is clear and made known to the beneficiary").

The August 8, 1994 Amato letter was, on its face, a "revised" letter, but it was not a "clear repudiation" by Barclays of Innes' entitlement to benefits under the Restoration Plan. It did not refer to the May 1994 letter or specify either what was being revised or under what authority a revision was being made. The second letter did not refer to any specific plan language or notify Innes about any past or proposed amendment to the Barclays' retirement plan. The letter did not advise Innes that she should contact the Plan Administrator immediately if she disagreed with the content of the letter. Rather, that letter, like the May 1994 letter, merely instructed Innes to contact the pension trustees six months prior to December 1, 2013, when she would reach normal retirement age. The actual content of the August 8, 1994 letter was insufficient to put Innes on notice that she needed to resolve anything in the interim.

Innes recognized that she had been given two letters containing some conflicting information, but never understood the August 8, 1994 letter to be either a "clear repudiation" of her entitlement to benefits under the Restoration Plan or even a definitive statement concerning what those benefits would be in the future when she was eligible to receive them. In fact, the benefit calculations attached to

17

both the May 1994 and August 8, 1994 letters included an express disclaimer, which advised her that "there's always a possibility of error" in the calculations. JA at 192 and 196.  By Barclays' own admission, these figures were not set in stone and might change by the time she applied for benefits.

Unlike the District Court Judge, Innes was not an attorney or someone sophisticated in pension matters.  From a lay person's perspective, she understood what both letters told her:  that the calculations were not necessarily final, and that she should contact the pension trustees in 2013 when she became eligible for benefits and any discrepancy in the information she had been given would be resolved at that time.

Second, the law is clear that where a plaintiff's claim to benefits is still subject to further administrative review, as in Innes' case, a plaintiff does not have "knowledge of a clear repudiation of [her] rights under the plan because there is still the possibility that the plan will award [her] the benefits after all."  <u>Wallace v. Freight Drivers & Helpers Local No. 557 Pension Fund</u>, 2012 U.S. Dist. LEXIS 91321 at *23 (D. Md. 2012) (Where plaintiff did not become aware of alleged amendments to the plan and their effect on the calculation of his benefits until he received the initial denial of his claim for benefits, his cause of action could not have accrued until his claim was finally decided).  <u>See also</u> <u>White v. Sun Life Assurance Co.</u>, 488 F.3d at 247 (starting the clock on participants' benefit claims

18

before they have exhausted administrative remedies and are able to file suit runs

afoul of ERISA's single scheme of mutually enforcing remedies:  internal

administrative review and judicial review).

In this case, when Innes received the August 8, 1994 Amato letter, she knew

nothing about either the 1992 or July 1994 amendments to the definition of

"compensation" in the Plan[9].  Additionally, she was still nineteen years away from

applying for her retirement benefits.  Since she had never applied, her claim was

still subject to further administrative review, and the "narrow exception" to the

general rule simply does not apply on the facts of her case.  In fact, the initial case

she filed in the District Court was dismissed for that very reason – that her claim

was not ripe because she had not exhausted all available administrative remedies.

JA at 645-46.

Similarly, Innes' very limited exposure to the Boyd Case, to which she was

never even a party, was nothing more than appearing for one deposition in June

1997 as a person who had received a Special Pay bonus in 1994.  Appearing for a

non-party deposition simply cannot constitute a "clear and continuing

repudiation" by Barclays of her entitlement to benefits.  In fact, Barclays took

absolutely no affirmative act toward Innes in the context of the Boyd Case which

could even remotely be construed as a clear repudiation of her entitlement to any

---

[9] See section 1 (C), infra.

19

specific pension benefit.  Additionally, there is no evidence in the record which even suggests that any other participant in the Boyd Case advised her that she needed to take any action concerning her future benefits before she reached retirement age.

The facts of Innes' case are much more similar to the facts of the Rodriguez case, in which this Court reversed the District Court's dismissal of the case on the basis of the statute of limitations and applied the general rule.  In Rodriguez, the plaintiff was a retired marine engineer who became a member of the Maritime Engineer Beneficial Association ("MEBA") in 1944.  Upon his retirement in 1965, he began receiving a small monthly pension.  Two years later, Rodriguez took a job as a port engineer for Sea-Land Service, Inc. ("Sea-Land").  Sea-Land entered into a collective bargaining agreement with MEBA in 1968 and in October, 1968, the MEBA pension trust regulations were amended and Sea-Land employees who were already receiving pension benefits were offered the option of suspending their pension checks and accruing further benefits, or continuing to receive pension checks but foregoing further accruals.

In December 1972, Rodriguez wrote the MEBA trust administrator, requesting a clarification of the status of his pension.  The administrator responded in March 1973, advising Rodriguez that he could have elected to have his pension benefits suspended under the 1968 option, but that since he chose to continue to

receive pension benefits, he could accrue no further credits.  For the next twelve years, Rodriguez did not question his rights under the 1968 option.

In January 1985, anticipating his retirement from Sea-Land, Rodriguez wrote the administrator of the MEBA trust again, requesting information about a lump sum payment of benefits.  The pension trust manager advised him that such a payment was not available because of his failure to suspend pension payments under the 1968 option.  Rodriguez then requested a formal review of his denial of benefits.  The pension trust reviewed the plaintiff's request on three separate occasions and denied it each time predicated upon his failure to suspend pension payments under the 1968 option.

In December 1987, Rodriguez filed suit under ERISA, challenging the MEBA Pension Trust's denial of requested pension benefits.  The defendants asserted various defenses to his claim, including that the case was untimely because he had known about the pension trust's position that he failed to exercise the option since at least the 1973 letter and did not file suit until 1986.  The district court dismissed his case.  On appeal, however, this Court reversed the district court on the statute of limitations issue, and held that because Rodriguez did not make his claim until 1985 and formal denial did not come from the Pension Trust until February 1986, his cause of action under ERISA did not accrue until 1986.  Id. at 72.  This Court explained:

21

> To hold otherwise would require lay <u>participants</u> and <u>beneficiaries</u> to be constantly alert for "errors or abuses" that might give rise to a claim and start the statute of limitations running . . . It would also burden the judicial system with multiple and premature actions.

<u>Id</u>. (emphasis added).

Because Innes did not apply for benefits under the Restoration Plan until December 2014, her claim under ERISA accrued at the earliest on April 2, 2015, when she was denied benefits as the result of the Pension Committee's denial of her appeal.  Thus her claim is not time-barred, and this Court should reverse the District Court's error.

## II.    THIS COURT SHOULD REVIEW THE DECISION TO DENY BENEFITS UNDER THE RESTORATION PLAN *DE NOVO*.

Under settled case law, when a plan by its terms confers discretion on the plan's administrator to interpret its provisions and the administrator acts reasonably within the scope of that discretion, courts routinely defer to the administrator's interpretation, "so long as its decision is reasonable."  <u>Booth v. Wal-Mart Stores, Inc.</u>, 201 F.3d 335, 341 (4th Cir. 2000); <u>Colucci v. Agfa Corp. Severance Pay Plan</u>, 431 F.3d 170, 176 (4th Cir. 2005). "[A]n administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence."  <u>Evans v. Eaton Corp. Long Term Disability Plan</u>, 514 F.3d 315, 322 (4th Cir. 2008).  Substantial evidence is evidence that "a reasoning mind would accept as sufficient to support a particular

conclusion." <u>LeFebre v. Westinghouse Electric Corp.</u>, 747 F.2d 197, 208 (4th Cir. 1984).[10]

The specific reasons Paul Imbimbo, Plan Administrator, gave for denying Innes' claim were neither reasonable nor supported by substantial evidence in the record before the District Court, and therefore the District Court's deference to the Plan Administrator's decision was misplaced and in error.  Although Mr. Imbimbo cited different pension plan documents in each of his denial letters,[11] the specific reasons he gave were consistent:

1) The special payment was stay-pay which is excluded from the definition of pensionable compensation under the retirement plan document; and

2) Innes' claim was barred by the applicable statute of limitations.

---

[10] This Court has identified eight non-exclusive factors that a court may consider "in determining whether a Plan Administrator abused its discretion in denying a benefits claim.  Those factors are:  (1) The language of the plan; (2) The purpose and goals of the plan; (3) The adequacy of the materials considered to make the decision and the degree to which they support it; (4) Whether the decision-making process was reasoned and principled; (5) Whether the decision-making process was reasoned and comports with other provisions in the plan and with earlier interpretations of the plan; (6) Whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) Any external standard relevant to the exercise of discretion; and (8) The Administrator's motives or any conflicts of interest it may have.  <u>Champion v. Black and Decker (U.S.), Inc.</u>, 550 F.3d 353, 358 (4th Cir. 2008) (quoting <u>Booth</u>, 201 F.3d at 342-43.)
[11] JA at 214 and 320.  Mr. Imbimbo relies upon language in the 1989 Plan in his first denial letter and language in the 1984 Plan as authority to deny Innes' appeal.

JA at 214 and 320.  Innes respectfully submits that this Court must review the

District Court's deference to the Plan Administrator's decision in this case *de novo*

for at least the following reasons:

> **A.    The Administrator's Decision to Deny Innes Benefits Under the Restoration Plan is Neither Supported by Substantial Evidence Nor a Product of a Deliberate and Principled Reasoning Process.**

In applying the <u>Booth</u> factors, courts have routinely considered the source

and amount of information relied upon by the Plan Administrator in denying

benefits.  <u>See</u> e.g., <u>Hunter v. Aetna Life Ins. Co.</u>, 2012 U.S. Dist. LEXIS 134911

(W.D. Va. 2012).  A review of the administrative record filed in this case discloses

that in denying Innes' claim for benefits under the Restoration Plan, the Plan

Administrator relied on some, but not all, of the plan documents, and on the advice

of Kiran Mehta ("Mehta"), counsel for Barclays both in this case and in the Boyd

Case in the 1990's.  Mehta wrote a lengthy memorandum for the Plan

Administrator dated December 22, 2014 as counsel for the plan and defense

counsel both in this case and the earlier Boyd Case, which summarizes the primary

issues in and certain deposition testimony taken in the Boyd Case (the "Mehta

Memorandum").  In fact, the Mehta Memorandum appears in two separate places

in the Administrative Record.  JA at 284 and 330.

Because the plan documents prior to 1992 did not even mention stay pay and

because Innes was never given notice of the 1992 amendments to the definition of

compensation in the plans, nothing in the plan language provides a reasoned basis for denying the disputed benefit to Innes.  The Mehta Memorandum interjects extraneous and irrelevant information which the Plan Administrator evidently relied heavily upon, with the result that he lost his objectivity, ignored his fiduciary duty of loyalty to Innes and failed to make a principled and unbiased determination about Innes' entitlement to benefits.

## 1.    Lack of Substantial Evidence

### a.    The District Court Mischaracterized the February 1994 Bonus As "Stay-Pay"

Although the District Court deferred to the Plan Administrator's characterization of the Special Pay bonus that Innes and eleven other key BCC employees received in February 1994 as "stay pay," or a retention bonus, a category of pay expressly excluded from the definition of "compensation" as set forth in plan documents as amended in 1992, nothing in the Administrative Record bears out that characterization.  The pay vouchers Innes and other payees received described the bonus as "Special Pay."[12]  There is no evidence in the record that the participants in this bonus pool were ever advised that these payments were retention bonuses or "stay-pay."

---

[12] See Innes' Pay Voucher, JA at 404.

To the contrary, from the inception of discussions about the bonus pool, it is indisputably clear that these bonuses were intended to award participants for their knowledge of the company being offered and their additional and extra efforts expended and time worked on behalf of Barclays during the entire sales process. The payment of any bonus was always contingent on a successful closing of the sale. If the deal closed, a bonus would be paid to a group of employees who contributed meritoriously to that successful effort. If, on the other hand, the deal did not close, there would be no bonus paid at all. Throughout the process, however, Barclays' intent was to encourage key employees to make every effort to maximize both the chance for a successful closing and the sales price it would realize from the sale of BCC.

In a July 30, 1993 letter from Peter Bland ("Bland"), Chief Executive Officer of Commercial and Credit Services for Barclays, to Innes, Bland describes the special bonus as a "closing bonus:"

> In addition to the 1993 MIP payments and the effect on the Security Agreement . . . we are prepared to consider what we are calling a closing bonus . . . . <u>You will be eligible to participate in this bonus which will be judged payable to those who contribute fully and who facilitate a smooth and effective transition to the acquiring entity</u> . . . .

(emphasis added). JA at 347. In that letter, eligibility for the Special Pay is clearly tied to contributing fully to a successful sale and not merely to remaining employed until closing.

Similarly, a September 20, 1993 letter from Richard M. Webb ("Webb"), Chief Executive Officer of Barclays Bank North America, to Edward Boyd, President of BCC, identifies a "pool of funds" to be paid to key executives upon a "successful closing of the sales transaction." JA at 350. Boyd replies to that correspondence in a September 27, 1993 letter to Webb recommending a $3.5 million pool of funds to be distributed to twelve listed people, but never characterizing the payments as "stay-pay." JA at 352. In fact, the reference line in the letter states only "Executive Compensation Arrangements."

The pay stub Innes received with her bonus check clearly said "Special Pay" and the Special Pay was reported as income on Innes' 1994 W-2 for tax reporting purposes. JA at 404, 406-09. Even Paul Imbimbo's April 2, 2015 letter denying Innes' administrative appeal references "Special Pay," although he then mischaracterizes Special Pay as "stay-pay" without providing any rationale for the change in nomenclature and then uses the recast label of "stay-pay" as the basis for denying her claim. JA at 320.

Significantly, until the Mehta Memorandum and Paul Imbimbo's denial letters, there is absolutely nothing in the record before the District Court which characterizes these special bonus payments as "stay-pay." That is especially telling because Section 1.12 of the 1984 Plan had been amended on June 19, 1992 and Section 1.3 of the 1989 Plan had been amended effective January 1, 1992 to

27

expressly exclude "stay-pay" and retention bonuses from the definition of pensionable compensation. By the time these letters about creating a bonus pool were written in 1993 and the Special Pay was paid on February 28, 1994, both versions of the plan included the terminology "stay-pay," and yet nobody at Barclays referred to these bonus payments as stay-pay. In fact, Richard Webb, CEO of Barclays USA, in all of his correspondence with various BCC executives and with recipients of the Special Pay bonus NEVER used the words "stay-pay" to describe the Special Pay.

Section 1.3 of the 1989 Plan was further amended on July 26, 1994, <u>after</u> these payments were made and <u>after</u> Innes had left her employment with BCC, to revise the definition of "annual compensation," and the amendment expressly makes that modification effective on July 26, 1994:

> <u>Effective as of July 26, 1994</u>, no amount received by a Participant as special pay, stay pay or severance pay, <u>including, but not limited to, any amount paid from any pool of funds created in connection with the sale of Barclays Commercial Corporation</u>, shall be included in the definition of Annual Compensation.

(emphasis added). JA at 57.[13] Significantly, that amendment excludes from compensation the pool of funds created in connection with the sale of BCC, which had closed on March 1, 1994. If Barclays had believed in July 1994 that these

---

[13] Section 1.12 of the 1984 Plan was also amended on July 26, 1994 to exclude the Special Pay bonus from the definition of compensation. JA at 591-92.

Special Pay bonuses were actually stay-pay, there would have been no need for the

July 26, 1994 amendment, because the 1992 amendments to the definition would

have effectively excluded these payments from pensionable compensation,

assuming that plan participants received proper notice of those amendments.  Thus,

the very fact of the July 26, 1994 amendment flies in the face of any

characterization of the February 28, 1994 Special Pay bonus as stay-pay.

> **b.     The Decision to Deny Benefits Is Not Supported by
> the Plan Language That Existed Prior to the 1992
> Amendment**

It is well established that a pension benefits plan regulated under ERISA is

interpreted using ordinary principles of contract law and enforcing the plan's plain

language in its ordinary sense.  Bailey v. Blue Cross and Blue Shield, 67 F.3d 53,

57 (4th Cir. 1995).  If the plan language is unambiguous, the Court will not defer to

a contrary interpretation by the Plan Administrator.  Davis v. Burlington Industries,

966 F.2d 890, 895 (4th Cir. 1992)

Section 1.12 of the 1984 Plan, prior to the 1992 amendment, defined

"Compensation," for purposes of calculating the pension benefit due an eligible

participant, as:

> "base pay, salary or wages paid to him by the Employer, plus
> overtime, commissions, bonuses paid through the end of the year in
> which the Accrued Benefit is determined, Management Incentive
> Payments (except such    payments made during 1983), including
> salary reduction amounts made  pursuant to Section 401(k), Section
> 125 and Section 129, but shall not include directors' fees,

29

> Management Incentive Payments which were deferred pursuant to a deferred compensation election by the Employee, or any amounts contributed for the Employee pursuant to this Plan or any other benefit plan or program of the Employer . . ."

JA at 467 (emphasis added).  Prior to the 1992 amendments, nothing in the plan language would justify the exclusion of the 1994 Special Pay bonus from pensionable compensation on the basis of characterizing them as "stay-pay" as the Plan Administrator did in this case.

    c. **The Plan Administrator Could Not Have Reasonably Relied Upon Either the 1992 or 1994 Amendments to the Retirement Plans' Definition of Compensation.**

During 1992, the definitions of "Compensation" in both the 1984 Plan and the 1989 Plan were amended to exclude "stay-pay" and retention bonuses from pensionable compensation.  While Section 12.01 of the 1984 Plan permits the Employer to make changes to the plan, the language authorizing changes has several express limitations, including:  ". . . (ii) the amount of benefits which at the time of any such modification, alteration or amendment accrued for any individual shall not be adversely affected except as provided in Section 12.04 upon plan termination . . ."[14]  Additionally, ERISA contains certain notice requirements to

---

[14] See also 1989 Plan, paragraph 10.1., JA at 131.  ("No amendment shall either reduce the Accrued Benefit of any Participant under the Plan . . . , or eliminate, reduce, or result in prohibited employer discretion with respect to any protected benefit . . .")

participants in the event of a plan amendment, which, based upon the evidence

presented in the District Court, Barclays simply ignored.

### (1.) The 1992 Amendments to the Definition of "Compensation" are Void for Lack of Notice

For any ERISA regulated pension plans, advance notice of an amendment to

a plan is required where the proposed amendment results in a significant reduction

in the rate of future benefits under Section 204(h) of ERISA.  29 U.S.C. § 1054(h);

26 CFR § 1.411(d)-6.  Additionally, for any "material" change in a plan document,

notice must be given to plan participant within two hundred ten (210) days

following the last day of the year in which the modification to the plan was

effective.  29 U.S.C. § 1024(b)(1)[15].

ERISA § 102(a) and 104(b) require Plan Administrators to provide

beneficiaries with summary plan descriptions and summaries of material

modifications "within a manner calculated to be understood by the average plan

participant," that are "sufficiently accurate and comprehensive to reasonably

---

[15] In addition to requiring that employee benefit plans be governed by a "written instrument", ERISA obligates a plan's administrator to disclose certain information about the plan to participants.  Every five years, assuming amendments have been make to a plan during that period, a Plan Administrator MUST provide plan participants with an updated summary plan description.  Between the publication of summary plan descriptions, a Plan Administrator MUST inform participants of material modifications to the plan by issuing a summary of material modifications within 210 days of the close of the plan year in which the change was adopted.  29 C.F.R. § 2520.104b-3 (a).

apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. §§ 1022(a), 1024(b). Where Plan Administrators fail to give the statutorily required notice to participants, courts decline to apply or enforce amendments to the plan language. See Helton v. AT&T Inc., 709 F.3d 343, 360 (4th Cir. 2013) (where there was no evidence introduced in the trial court to establish that the required notice was given to plan participants, denying benefits based upon amended language was an abuse of discretion); Collins v. Seafarers Pension Trust, 846 F.2d 936 (4th Cir. 1988).

Innes never received any notice either before or after the 1992 amendments to the 1984 Plan and the 1989 Plan were adopted which alerted her to either the modification or the potential impact on her pension benefits. JA at 357 (¶ 26).[16] Absent the legally required notice, this "amendment," which the Plan Administrator concluded should exclude the special bonus from pensionable compensation as "stay-pay," should not be enforced by the Court to deny Innes benefits she is otherwise entitled to under the Restoration Plan.

---

[16] Similarly, Terry Oelschlaeger, a Vice-President with BCC, received no notice of these plan amendments. JA at 361 (¶ 18).

### (2.) The July 26, 1994 Amendment is Void Both for Lack of Notice and Because it Reduces Accrued Benefits in Violation of ERISA

ERISA restricts amendments to a plan which cut back benefits which have already accrued to a participant[17] and requires that notice of any such amendment "shall be provided within a reasonable time <u>before</u> the effective date of the plan amendment."  29 U.S.C. § 1054 (emphasis added).  In <u>DiCioccio v. Duquesne Light Co.</u>, 911 F. Supp. 880 (W.D. Pa. 1995), the U. S. District Court for the Western District of Pennsylvania held that even though a pension Plan Administrator had discretion to determine what compensation was included in the computation of retirement benefits, the administrator's failure to give proper notice of an amendment made to the plan's definition of compensation was a violation of ERISA (29 U.S.C. § 1054(h)) and that the administrator abused her discretion in administering the plan.

In <u>DiCioccio</u>, a group of retirees from Duquesne Light Company ("Duquesne") sued seeking a declaration that Duquesne's pension Plan Administrator was required to include in the calculation of pension benefits income from the plaintiffs' exercise of stock option and appreciation rights in 1989.  The

---

[17] 26 U.S.C. 411(d)(6) (anti-cutback statute).  ERISA's anti-cutback rule provides that "[t] the accrued benefit of a participant under a plan may not be decreased by an amendment of the plan . . . 29 U.S.C. § 1054(g)(1).

plaintiff had exercised some of their stock options in 1989, the first year they could be exercised.

Thereafter, after plaintiff's exercise of stock options in 1989, by "de facto amendment," the Plan Administrator changed several aspects of the retirement plans, without giving any notice to the retirees.  The District Court concluded that retirees who had exercised their stock options and appreciation rights in 1989 and had the income reported on their W-2's acquired an accrued benefit.  The Court further held that the Plan Administrator violated ERISA when she denied that benefit, reasoning:  "It follows *a fortiori* that an accrued benefit may not be retroactively decreased through the purported exercise of an administrator's discretion."  Id. at 897.

Factually, the DiCioccio case is compellingly similar to Innes' case.  Innes received a special performance bonus on or about February 28, 1994, which was reported as income on Innes' 1994 W-2.  Months later on July 26, 1994, Barclays amended the definition of "Compensation" in the plan to retroactively exclude from pension calculations the special bonuses paid in connection with the sale of BCC, without any notice to bonus pool recipients of an amendment to the plan.  As the DiCioccio Court held, that kind of retroactive denial of an accrued benefit by amendment is a violation of ERISA, and one which the District Court should not have approved.

### 2.    Lack of Principled Reasoning Process

#### a.    The Plan Administrator Has a Conflict of Interest in Relation to Innes' Claim Because He Has a Duty to Act in Her Interest

Pursuant to Section 9 of the 1989 Plan, the Plan Administrator is charged with responsibility to administer the plan, establish investment guidelines and carry out funding policy for the plan.  Section 9.5, JA at 124.  The Administrator is authorized to interpret the plan, determine eligibility for benefits and determine all questions of fact.  Section 9.7(a), JA at 126.  The Administrator is further entrusted to manage, acquire or dispose of plan assets.  Section 9.9, JA at 127.  The Plan Administrator is a fiduciary with respect to plan beneficiaries.  Section 9.11, JA at 129.  In fact, Section 9.11 of the 1989 Plan states that every plan fiduciary "SHALL discharge his duties to the Plan solely in the interest of the plan participants and beneficiaries…." (emphasis added).  Id.

Because a Plan Administrator is both authorized to exercise discretion in interpreting and applying the plan documents and serves a fiduciary for all plan beneficiaries, a conflict of interest frequently arises when administrators are required to make benefit eligibility decisions.  However, as the 1989 Plan requires, an ERISA fiduciary must act "solely "in the interest of the participants and beneficiaries under 29 U.S.C. § 1104(a)(1)(A).  Bedrick v. Travelers Ins. Co., 93 F.3d 149, 154 (4th Cir. 1996).  ERISA tolerates the existence of conflict of interest

35

attendant to a plan administrator serving as arbiter of eligibility and payer of claims, but does not tolerate any adverse consequence to plan beneficiaries, such as Innes.

As the U.S. Supreme Court emphasized in Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008), it is the application of trust principles that justifies courts' deference to a plan administrator's judgment in many cases. Id. at 116 (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989)). In Firestone, the U.S. Supreme Court clarified several principles which govern a court's review of a plan administrator's denial of benefits. Id. at 111-13. In relevant part, it explained, "In determining the appropriate standard of review," a court should be "guided by principles of trust law"; in doing so, it should analogize a plan administrator to the trustee of a common-law trust; and it should consider a benefit determination to be a fiduciary act (i.e., an act in which the administrator **owes a special duty of loyalty to the plan beneficiaries**). Id. (citing Aetna Health Inc. v. Davila, 542 U.S. 200, 218 (2004)) (emphasis added, other citations omitted).[18]

Consequently, it is only because the Plan Administrator owes this fiduciary duty of loyalty to every plan participant that a court should accord an

---

[18] The ERISA statute requires pension plan fiduciaries to act solely in the interest of participants. 29 U.S.C.S. § 1104(a)(1) codifies the traditional fiduciary duty of loyalty. Davis v. Bowman Apple Products, Inc., 2002 U.S. Dist. LEXIS 6204 (W.D. Va. 2002).

36

administrator's decision any substantial deference.  If the evidence makes it clear

either that the administrator has acted in a self-interested manner in denying

benefits or that the administrator has otherwise failed to carry out its fiduciary

duty, that is a factor to be considered along with the other Booth factors in

weighing the reasonableness of the administrator's decision.

Under Glenn, facts which suggest improper motives on the part of a Plan

Administrator are still important considerations for the court in determining

whether the administrator abused his discretion, especially when circumstances

suggest a higher likelihood that the conflict of interest affected the actual benefits

decision.  Glenn at 110-11.  See also Carden v. Aetna Life Ins. Co., 559 F.3d 256

(4th Cir. 2009) ("As the result of Glenn, whenever a plan administrator employs its

interpretive discretion to construe an ambiguous provision in favor of its financial

interest, that fact may be considered as a factor weighing against the

reasonableness of its decision.")

A review of the Administrative Record filed in this case makes it clear that

Paul Imbimbo, the Plan Administrator, was not focused on reviewing and

interpreting the plan documents with an eye to his fiduciary duty of loyalty to

Innes as a plan beneficiary.  First, there was evident bias in the actual content of

the Administrative Record, which included the Defendants' Memorandum in

Support of the Motion to Dismiss filed in response to Innes' initial Complaint

(Case No.: 3:14-cv-0008), but did not include Innes' Opposition Memorandum. JA at 298. A perusal of the Administrative Record demonstrates that the Plan Administrator likely did not even review all of the plan documents in making his decision. The Administrative Record includes the Restoration Plan (JA at 37), the 1989 Plan as amended through July 26, 1994 (JA at 45), without copies of the actual amendments, and Amendment XII to the 1984 Plan (JA at 326). Those are precisely the plan documents referenced in the Mehta Memorandum.

Additionally, the Plan Administrator had in his possession and certainly reviewed, since it is included in two places in the Administrative Record[19], the Mehta Memorandum. That Memorandum summarized the earlier Boyd Case, emphasized defense counsel's opinion that the Special Pay bonuses were non-pensionable retention payments, and advanced various legal arguments concerning why Innes' claim for benefits was not timely filed.

This Court has recognized precisely that kind of bias as an abuse of the plan administrator's discretion and a clear conflict of interest. Johannssen v. Dist. No 1 – Pac. Coast Dist., 292 F.3d 159 (4th Cir. 2002). In that case, three retirees claimed eligibility for past service credits under a 1992 amendment to their pension plan. The plan administrator denied their claims, initially taking the position that the 1992 amendment was void and unenforceable.

---

[19] JA at 284 and 330.

In August 1999, the U. S. District Court for the District of Maryland held the amendment valid and ordered the plan administrator to determine plaintiffs' eligibility for past service credits under the amendment. When the plan administrator granted far fewer service credits than plaintiffs contended they were entitled to, they filed a second suit. Concluding that the plan administrator abused his discretion due to a conflict of interest, this Court reasoned:

> Applying <u>Booth</u>, the District Court first determined that [the plan administrator] was seized of a conflict of interest. We agree. Much like [the plan administrator] before him, [the plan administrator] relied heavily on biased information in making his determination. Specifically, he relied on defense counsel to select documents from trial and other sources to be used in interpreting the 1992 Amendment. In so doing, he imported [the Employer's] interest into this deliberation process, making its conflict his own. Also like Hart, a conflict of interest was present for [the plan administrator] because he was aligned with the leadership of [the Employer] and the litigation position of the plan . . .

<u>Id</u>. at 176 (emphasis added).

The Mehta Memorandum lacked objectivity and balance and created unavoidable bias in the decision-making process in at least four ways:

- The Memorandum never advises the Plan Administrator that as a plan fiduciary, he owes Innes a duty to act solely in her interest in making a benefit determination.

- The Memorandum recites language from Amendment XII to Section 1.12 (of the 1984 Plan) as amended on January 1, 1992, but never advises the Plan Administrator that because participants like Innes were never given notice of the 1992 amendment, the 1992 changes to the definition of compensation do not govern her claim for benefits. JA at 285.

39

- The Memorandum selectively interprets and erroneously argues the conclusion to be drawn from correspondence which preceded the Special Pay bonus, i.e., that it was intended as a retention payment.

- The Memorandum goes into unnecessary detail about the history of the Boyd Case, to which Innes was not a party.

In order for the Plan Administrator to make a decision on Innes' claim, he did not need to know anything about even the facts of the Boyd Case. That case resulted in a confidential settlement which required Barclays to pay some amount of money to the plaintiffs, but which never produced any ruling on the merits of the plaintiffs' claims which might have provided some guidance to the Plan Administrator. Notwithstanding the fact that the key issue presented in that case was never decided by a court, the Mehta Memorandum goes way beyond a simple recitation of facts surrounding the creation of this bonus pool or the recipients of the Special Pay bonus and selectively cites far-reaching deposition testimony by various persons, including Innes, to argue that the Special Pay was intended to be stay-pay. The Administrative Record even includes a copy of the transcript of the deposition taken of Innes in the Boyd Case. JA at 221. Thus, the Mehta Memorandum unavoidably presents a very one-sided, biased view of Innes' claim.

The Mehta Memorandum effectively but wrongfully suggests the conclusion Imbimbo should reach on Innes' claim, which, of course, was consistent with the legal position Mehta had taken in the Boyd Case. In fact, Imbimbo's April 2, 2015

letter denying Innes' appeal recites language from the Mehta Memorandum almost verbatim.[20]   The inescapable result of the Plan Administrator's consideration of the Mehta Memorandum is that the denial of Innes' claim was not an unbiased or independent determination by the Plan Administrator fulfilling his duty of loyalty to a plan participant, but was infused with the bias of the employer's counsel advocating the employer's position and ignoring the interests of the plan participant.  The result was a decision unfavorable to Innes, who is supposed to be protected by both ERISA and the plan fiduciaries.

It is unavoidable that the conflict inherent in the structure of the plan, combined with the conflict inherent in the very suggestive and misleading Mehta Memorandum being included in the Administrative Record in this case, coupled with the fact that the Plan Administrator clearly relied upon its contents, renders the Plan Administrator's denial of Innes' claim the product of bias and a clear abuse of his discretion.  Innes respectfully submits that the Court should not give any deference to the District Court's decision, but should review Innes' claim to benefits under the Restoration Plan *de novo.*

---

[20] See Mehta Memorandum, JA at 288-89, and Imbimbo April 4, 2015 Letter, JA at 321.

41

## CONCLUSION

When an appellate court concludes that a Plan Administrator has abused his discretion, the Court may simply award benefits rather than remand the case to the District Court.  Helton v. AT&T Inc., 709 F.3d 343, 360 (4th Cir. 2013); Gorski v. ITT Long Term Dis. Plan for Salaried Employees, 314 Fed. App'x 540, 548 (4th Cir. 2008).

Innes was entitled to receive $1,585.84 per month under the Restoration Plan beginning December 1, 2013.  She has received nothing to date.  Therefore, she respectfully requests this Court to reverse the District Court, and to enter an Order requiring the Pension Committee to compensate her as follows:  (1) to begin paying her the $1,585.84 per month benefit going forward; (2) to make a lump-sum payment to her for past accrued benefits beginning December 1, 2013 at six percent interest; and (3) to reimburse her attorneys' fees pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

<div style="margin-left: 2em;">

Respectfully submitted,

s/ Joseph W. Wright, III
JOSEPH W. WRIGHT, III
DYGERT, WRIGHT, HOBBS & HEILBERG, PLC
415 4th Street, N.E.
Charlottesville, Virginia 22902
(434) 979-5515
(434) 295-7785 (fax)

Counsel for Carol Forester Innes

</div>

May 15, 2017

# CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding the

parts of the document exempted by Fed. R. App. P. 32(f) (cover page,

disclosure statement, table of contents, table of citations, statement regarding

oral argument, signature block, certificates of counsel, addendum,

attachments):

   this document contains <u>10,089</u> words.

2.    This document complies with the typeface requirements because:

   this document has been prepared in a proportional spaced typeface
   using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

Dated:  May 15, 2017                    <u>/s/ Joseph W. Wright, III</u>
                                        Joseph W. Wright, III

                                        *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on May 15, 2017, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF System, which will send notice of such

filing to all the registered CM/ECF users.

The necessary filing and service were performed in accordance with the

instructions given to me by counsel in this case.

/s/ Karen R. Taylor
Karen R. Taylor
GIBSON MOORE APPELLATE SERVICES, LLC
P.O. Box 1460
Richmond, VA  23218
(804) 249-7770
karen@gibsonmoore.net